UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
In re                                      :
                                           :    Chapter 11
                                           :
NETWORK PLUS CORP., et al.,                :    Case No. 02-10341 (PJW)
                                           :
           Debtors.                        :    (Jointly Administered)
                                           :
------------------------------------------------------x

APPLICATION PURSUANT TO SECTIONS 327(e) AND
328(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION
TO RETAIN AND EMPLOY SWIDLER BERLIN
SHEREFF FRIEDMAN, LLP AS SPECIAL
UNITED STATES REGULATORY COUNSEL TO THE DEBTORS

TO THE HONORABLE
UNITED STATES BANKRUPTCY JUDGE:

Network Plus Corp. and certain of its direct and indirect affiliates and subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), respectfully represent:

### Background

1. On the February 4, 2002 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases, and no official committees have been appointed or designated.

2. Network Plus Corp. ("Parent") is a publicly traded Delaware corporation with approximately sixty-nine (69) million shares of common stock held directly by

approximately 350 registered shareholders and approximately 250,000 shares of Series A cumulative convertible preferred stock held directly by approximately twelve (12) registered shareholders, with each class of shares likely held indirectly through many more holders as some of such registered shareholders are financial institutions which may hold such shares in "street name" on behalf of any number of individual investors. Parent's shares of common stock are traded on the NASDAQ market (Ticker: NPLS).

3. Network Plus, Inc. ("Network Plus"), a wholly-owned subsidiary of Parent and Parent's primary asset, is a Massachusetts corporation and is the only Debtor with operations. Network Plus operates an expansive telecommunications network that allows Network Plus to provide local telephone service, high speed data services, ISP services and web and data hosting services to small and medium business customers in Connecticut, Florida, Georgia, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania and Rhode Island, with significant market penetration in several of these states. In addition, Network Plus operates an expansive long distance telecommunications network through which long distance telephone service, international telephone service and toll free service is provided to businesses located throughout the continental United States.

4. The Debtors serve approximately 75,000 customers (including a number of hospitals, trial courts, universities, religious organizations and many other public service and charitable organizations) representing in excess of 300,000 local access lines and 300,000 long distance access lines and, just prior to the Petition Date, employed approximately 1,000 employees located throughout a number of states, with approximately 600 employees based at their headquarters in Randolph, Massachusetts.

For the three (3) months and the nine (9) months ended September 30, 2001, the Debtors reported revenues of approximately $76,284,000 and $224,528,000, respectively. For the fiscal quarter ended September 30, 2001, the Debtors reported a year to date net loss of approximately $28,785,000, but a positive EBITDA of $100,000 for the quarter ended September 30, 2001.

5. Although the Debtors suffered losses in each quarter since their initial public offering in June of 1999, the Debtors continued to meet their business plan, developed and expanded their network infrastructure, product offerings and information technology systems and continued to increase the number of local and long distance lines that they provided to customers. The general decline in the telecommunications industry and the decrease in demand for data and international services, however, resulted in the Debtors suffering losses which were slightly greater, and revenues which were lower, than projected in the second and third quarters of 2001. These shortfalls resulted in the Debtors tripping certain financial covenants under their Credit and Guaranty Agreement, dated as of September 27, 2000 (as amended, supplemented or otherwise modified, the "Credit Facility"), by and among the Debtors, the lenders party thereto from time to time (the "Lenders") and Fleet National Bank as administrative and collateral agent (the "Agent"). The Debtors negotiated with the Lenders and obtained certain limited amendments to, and waivers of, these financial covenants, which allowed the Debtors to continue to borrow up to $175 million under the Credit Facility, but did not provide access to the full $225 million contemplated by the Credit Facility which was necessary for a complete implementation of their business plan.

6. During this time, the Debtors also engaged in discussions with the Lenders to reset, in light of such market conditions, certain financial covenants and other terms of the Credit Facility and to provide the Debtors with the additional necessary funding. In connection with such discussions, the Lenders required the Debtors to retain an investment banker to assist the Debtors in locating and obtaining additional capital through asset sales and/or equity investments. The Debtors promptly retained UBS Warburg in early December 2001. Since that time, active discussions have occurred with potential financial and strategic buyers for the Debtors' business and/or assets. The Debtors negotiated an extension of the previous financial covenant waivers through January 31, 2002. The extension also provided the Debtors with access to an additional $3 million in funds to support the Debtors' operations through the end of such period, but provided no other funding.

7. Despite restructuring their work force, modifying their network cost structure and exiting unprofitable business lines, the Debtors have been unable to obtain outside of chapter 11 the necessary funding to meet their ongoing expenses, including paying their employees and their vendors. Without the needed funding and as the Debtors received notices from critical service providers that service to and connection with the Debtors would be terminated, the Debtors feared that their customers could lose their "dial tone" service and concluded that, to preserve and protect the interests of creditors, shareholders and other interested parties, and more importantly, to protect the health, safety and welfare of the hundreds of thousands of individuals who rely on the Debtors for daily telephone service, including emergency E911 services, they had to file for bankruptcy protection.

## Jurisdiction

8.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Retention of Swidler Berlin Shereff Friedman, LLP

9.  By this Application, the Debtors seek to employ and retain Swidler Berlin Shereff Friedman, LLP ("Swidler") as their special United States regulatory counsel pursuant to sections 327(e) and 328(a) of the Bankruptcy Code. The Debtors seek authorization for Swidler to (a) advise them as to telecommunications regulatory requirements arising from a filing under the Bankruptcy Code; (b) represent Debtors as needed before telecommunications regulatory agencies; (c) advise Debtors on telecommunications regulatory issues involved with sales of assets or transfer of control by Debtors, if required, and Debtors' chapter 11 plan, including making any required regulatory filings, seeking required regulatory approvals, ensuring continued ability of Debtors and, if applicable, purchasers, to obtain telecommunications services from unrelated telecommunications vendors, and any other activities required to implement the asset sales and/or chapter 11 plan or to consummate any transactions contemplated thereby; and (d) any other necessary legal services and advice related to the matters described above.

10. Since May 1998, Swidler and certain of its members and associates have rendered legal services to the Debtors in connection with various matters. Swidler's services related primarily to counseling the Debtors on state and federal telecommunications regulatory issues arising from the Debtors' construction, installation,

operation and acquisition of telecommunications networks and their provision of telecommunications services.

11. As a consequence of its representation of the Debtors for the past 4 years, Swidler is intimately familiar with the complex legal issues that have arisen and are likely to arise in connection with the Debtors' business and operations, their restructuring, and their strategic and transactional goals. The Debtors believe that both the interruption and the duplicative cost involved in obtaining substitute counsel to replace Swidler's unique role at this juncture would be extremely harmful to the Debtors and their estates and creditors. Were the Debtors required to retain counsel other than Swidler in connection with the specific and limited matters upon which Swidler's advice is sought, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessary to replicate Swidler's ready familiarity with the intricacies of the Debtors' business operations, corporate and capital structure, and strategic prospects.

12. The Debtors submit that Swidler is well qualified and uniquely able to provide the specialized advice sought by the Debtors on a going forward basis. Swidler's telecommunications practice group is widely recognized for its telecommunications regulatory expertise. Swidler handles matters in virtually every aspect of telecommunications law, including local, long distance and international telephone common carriage; Internet services and technologies; conventional and emerging wireless services; satellite services; broadcasting; competitive video services; and telecommunications equipment manufacturing and other high technology applications. The firm counsels telecommunications and technology clients in transactional, securities, international, litigation, legislative and land use issues. The firm's practice includes

advising clients on matters related to their operations at the U.S. federal level, all 50 states, U.S. territories, and many international markets. Swidler also has represented numerous U.S. telecommunications carriers in reorganization and liquidation proceedings. Therefore, given Swidler's familiarity with the Debtors' business and operations and Swidler's expertise in the telecommunications field, Debtors believe Swidler will be an efficient provider of legal services with respect to matters of United States regulatory law. Swidler's retention as special United States regulatory counsel in these areas is in the best interest of the Debtors and their estates and creditors.

13. By separate Applications, the Debtors sought to employ and retain the law firms of Hale and Dorr LLP ("Hale and Dorr") and Young Conaway Stargatt Taylor, LLP ("Young Conaway") to serve as bankruptcy and reorganization attorneys for Debtors in these chapter 11 cases. Swidler will not serve as bankruptcy and reorganization counsel to the Debtors. While certain aspects of the representation will necessarily jointly involve Swidler, Hale and Dorr, and Young Conaway, the Debtors believe that the services Swidler will provide will be complementary rather than duplicative of the services to be performed by Hale and Dorr and Young Conaway as their bankruptcy counsel. The Debtors are very mindful of the need to avoid duplication of services, and appropriate procedures will be implemented to ensure that there is minimal duplication of effort as a result of Swidler's role as special United States regulatory counsel.

### Scope of Proposed Representation

14. As a telecommunications provider, the Debtors are subject to supervision and regulation by federal and state telecommunications regulators in the United States. A bankruptcy filing will require an ongoing review and analysis of such rules and

regulations. Therefore, the Debtors will need counsel well versed in the federal and state regulatory laws of the United States. The Debtors seek to retain Swidler to (a) advise them as to telecommunications regulatory requirements arising from a filing under the Bankruptcy Code; (b) represent Debtors as needed before telecommunications regulatory bodies; (c) advise Debtors on telecommunications regulatory issues involved with sales of assets or transfer of control by Debtors, if required, and Debtors' chapter 11 plan, including making any required regulatory filings, seeking required regulatory approvals, ensuring continued ability of Debtors and, if applicable, purchasers, to obtain telecommunications services from unrelated telecommunications vendors, and any other activities required to implement the asset sales and/or reorganization plan or to consummate any transactions contemplated thereby; and (d) any other necessary legal services and advice related to the matters described above.

15. Swidler has indicated its willingness to render the necessary professional services described above as special United States regulatory counsel. The Debtors reserve their rights to expand the scope of services to be provided by Swidler, if necessary.

### Swidler's Disinterestedness

16. To the best of the Debtors' knowledge, except as disclosed in the attached Affidavit of Jean L. Kiddoo (the "Kiddoo Affidavit") filed in support of this Application, the partners and other attorneys of Swidler (i) do not represent or hold any interest adverse to the Debtors and their estates with respect to the matters on which Swidler is to be retained in these cases and (ii) have no connection to the Debtors, the Debtors'

creditors or any other party in interest, or their respective attorneys and accountants, that would affect Swidler's ability to represent the Debtors in these cases.

17. Swidler will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new facts or relationships are discovered, Swidler will supplement its disclosure to the Court.

### Compensation

18. Subject to Court approval under section 330(a) of the Bankruptcy Code, compensation will be payable to Swidler on an hourly basis, plus reimbursement of actual, necessary expenses and other charges incurred by Swidler. The hourly rates charged by Swidler's attorneys that are currently expected to work on this matter are $325-$425 for partners, $150-$325 for other attorneys, and $110-$150 for legal assistants. These rates are consistent with the rates charged by Swidler in non-bankruptcy matters of this type and are subject to periodic adjustments to reflect economic and other conditions.

19. Swidler's hourly rates are set at a level designed to fairly compensate the firm for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses. Hourly rates vary with the experience and seniority of the individuals assigned and may be adjusted by Swidler from time to time. It is Swidler's policy to charge its clients in all areas of practice for all other services rendered and costs incurred in connection with a client's case. Those services and costs may include photocopying, messenger and delivery service, computerized research, travel, long distance telephone calls, telecopying, filing fees, staff overtime, and other similar services. Swidler will

charge the Debtors for these services in a manner and at rates consistent with charges made generally to its other clients.

20. Swidler will submit interim and final applications for compensation in accordance with the Bankruptcy Code and Bankruptcy Rules, the Local Rules for the District of Delaware and such other and further orders as the Court may direct.

21. No trustee, examiner or creditors' committee has been appointed in the Debtors' chapter 11 cases. Notice of this Application has been provided to (i) the Office of the United States Trustee for the District of Delaware, (ii) the attorneys for the Debtors' prepetition lenders, (iii) the Debtors thirty largest creditors and (iv) all those entities that have requested notices pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors submit that no other or further notice need be provided.

22. No previous application for the relief sought herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other or further relief as is just.

Dated: February __, 2002
    Boston, Massachusetts

                            NETWORK PLUS CORP., et al.
                            Debtors and Debtors in Possession

                            By: James J. Crowley
                            Authorized Officer of Each of the
                            Debtors